W. T. RAWLEIGH COMPANY V. B. B. LAND ET AL.

No. 4247.   Decided February 3, 1926.

(279 S. W., 810,   S. W.,   )

BY COMMISSION OF APPEALS.

1.—Agreement—Contract.

An agreement in contemplation of future sales and purchases between

the parties thereto constituted no contract in itself where the vendor did not bind himself to sell, nor the purchaser to buy anything, except as they should thereafter determine to do so. It was wholly contingent on their decision in the future to sell and to buy on the terms stated in their agreement, which alone created no right and no obligation. (P. 325.)

## 2.—Contract—Suspicious Provisions.

Such an agreement indicates the use of language to conceal thought and invites close scrutiny of its terms. A provision for the renewal of their dealings from year to year only if the dealings so far conducted are "mutually agreeable" creates no obligation, but contains a veiled threat that the dealings will continue only if the buyer conducts his business in such a manner as suits the seller. (P. 326.)

## 3.—Same—Salesmanship Literature—Conduct of Business.

The intent of a provision in such agreement that the seller is to furnish the buyer "salesmanship literature" to be considered only as "educational and advisory," and not as "orders and instructions" binding on him in connection with one that the business is to be renewed and continued only if "mutually agreeable," and may be terminated at any time at the will of the seller, is to be interpreted by the literature so furnished and the acts of the parties in carrying out such agreement. Where by these the buyer was restricted to a limited territory in his resales and forbidden to compete beyond such limits, evidence is disclosed of an intent by such instrument to limit competition, forbidden by the anti-trust laws of the State. (Rev. Stats., 1911, Arts. 7796, 7798, 7799, 7807; Penal Code, Art. 1466.) (Pp. 326-328.)

## 4.—Same—Inter-state Commerce.

Since the agreement and the business conducted under it by the buyer related only to the sales of goods after they were bought and received by him in the State and became his property, no element of interstate commerce appeared in the transaction to forbid the application of the anti-trust laws of the State. If any appeared it was too indirect and remote to oust the State's power. (Pp. 328, 329.)

## 5.—Consideration Illegal in Part.

A promise by the purchaser, in consideration of renewal of his contract for another year, to pay all sums due on his previous transactions was so mixed with the unlawful consideration underlying such indebtedness as to render it invalid—since a consideration in part illegal has such effect. (P. 329.)

## 6.—Illegal Contract—Guarantors.

Where a contract is illegal, it being declared a felony, guarantors of its performance as well as their principal are relieved from liability for its enforcement. (Pp. 330, 331.)

## 7.—Illegal Contract—Liability on Executed Transaction.

Where action can be maintained by plaintiff only upon an illegal contract the fact that it has been already executed does not prevent defendant from availing himself of its illegality as a defense. (P. 331.)

### 8.—Anti-trust Law—Evasion—Unlawful Contract—Case Stated.

A written agreement neither bound the seller to sell nor the purchaser to buy anything, but was made in contemplation of such future continuous transactions between them, and provided for the furnishing by the seller to the buyer of "salesmanship literature," advisory merely, and not as orders. It contained no agreement restricting the buyer in his resales to certain territory and forbidding him to compete with others beyond it or others to compete with him by sales within his own; yet as the continuance of the dealings between seller and buyer was to be terminated at the will of either party if not found mutually agreeable, and the "salesmanship literature" and the course of dealings between the parties contemplated a restriction of the limits within which the buyer was to resell, the contract, construed in the light of the restricted business so carried on by the parties and becoming a necessary condition of its continuance, is to be taken as an attempted evasion of the anti-trust laws of the State and an unlawful transaction on which no recovery could be had by the seller for the price of goods so sold. (P. 331.)

Error to the Court of Civil Appeals for the Sixth District, in an appeal from Fannin County.

The W. T. Rawleigh Co. sued Land as principal and G. W. Skinner, G. R. Bobo and J. T. Graham as guarantors. Judgment was rendered for defendants, and was affirmed on appeal by plaintiff (261 S. W., 186), who thereupon obtained writ of error. The Supreme Court referred the case to the Commission of Appeals, Section A, for its opinion thereon, and in rendering the judgment of affirmance there recommended appends a brief opinion showing the grounds of its concurrence.

*Thomas P. Steger, Black & Morrow,* and *Chas. L. Black,* for plaintiff in error.

A valid original contract cannot be changed or modified by a subsequent illegal and invalid contract. It appearing, therefore, that the original written contract between the parties was entirely valid and legal, and subsequent negotiations, consisting of the sending of letters, booklets, pamphlets, guide books, etc., containing suggestions and imposing restrictions violative of the anti-trust laws, cannot be considered as modifying or changing the original valid contract. Cain v. Bonner, 108 Texas, 299; Floyd v. Patterson, 72 Texas, 202; Hazwell v. Blake, 90 S. W., 1125; Troth v. Millville Bottling Co., 98 Atl., 435; Tucker v. West, 29 Ark., 386; Crossett v. Brockett, 105 Atl., 5; McCurdy v. Dillon, 98 N. W., 746; Ware v. Curry, 67 Ala., 274; Page on Contracts, Second Edition, Secs. 2458-2469; Elliott on Contracts, Secs. 1073, 1863, 1071, 1074, 1075; Rawleigh Co. v. Lemon, 247 S. W., 683.

The right to make a contract of sale, by virtue of which goods are to be shipped and delivered from one state to another, is a federal right, unregulated and unaffected by any state law; and the contract of sale, and each and every term and provision of the contract of sale, is immune from state regulation. The anti-trust laws of Texas are inapplicable to any transaction constituting interstate commerce. Albertype Co. v. Feist, 102 Texas, 219; Dr. Koch Vegetable Tea Co. v. Malone, 163 S. W., 662; Lyons v. Federal System of Bakeries, 290 Fed., 793, and cases cited; Dahnke-Walker Co. v. Bondurant, 257 U. S., 282; United States v. Chesapeake Fuel Co., 105 Fed., 93, affirmed, 115 Fed., 610; Sioux Remedy Co. v. Cope, 103 N. W., 683; Sioux Remedy Co. v. Cope, 235 U. S., 197; McCall Co. v. Stiff Dry Goods Co., 142 S. W., 659; A. Patrick & Co. v. Deschamps, 129 N. W., 1096; Dozier v. Alabama, 218 U. S., 124; York v. Colley, 247 U. S., 21.

The court erred in holding that plaintiff in error was not entitled to recover upon and by virtue of the new written agreement signed by the defendant in error Land in August, 1921, after he had ceased to do business with plaintiff in error, in which new contract defendant in error Land in writing approved the account of the plaintiff in error and made a new, distinct and separate contract to pay the amount of the account, representing the value of the goods shipped and delivered to him by plaintiff in error and retained by him. Young v. Beardsley, 11 Paige, 93; Wayman Anv. Co. Weasinger, 108 Pac., 1022; De Leon v. Trevino, 49 Texas, 93; Hall v. Edwards, 222 S. W., 168. Biccochi v. Casey-Swasey Co., 91 Texas, 251; Cotton States Building Co. v. Jones, 94 Texas, 502; Elliott on Contracts, Section 1085; McCall Co. v. Hughes, 59 Southern, 795.

*Cunningham, McMahon & Lipscomb,* for defendants in error.

The books, communications, papers, letters, etc., issued by the appellant and sent out by it to the defendant, B. B. Land, and to its retailers generally, were admissible, as tending to show the construction placed by the appellant on the business it was engaged in, and they were also admissible as furnishing light on the relative positions of the parties to the contract, and to uncover the power to dictate by a mere suggestion on the part of the appellant, etc. Caddle v. J. R. Watkins Medical Co., 227 S. W., 229; Newby v. W. T. Rawleigh Co., 194 S

W., 1174, 194 S. W., 1177; J. R. Watkins Co. v. Myers, 255 S. W., 1005.

In the case for the price of goods sold, the defense being that the plaintiff in the court below violated the Anti-Trust Act of the State of Texas, a finding of the jury to the effect that the plaintiff and the defendant contracted or agreed that the territory in which the principal defendant was to sell the goods shipped him by plaintiff was to be restricted, requires the trial court to enter a judgment in favor of the defendant; and under the settled law of the State of Texas, requires the appellate courts to affirm such judgment, there being evidence in the record requiring the submission of such questions, even where the seller lives out of the state and the transaction is an inter-state one. Vernon's Sayles' Annotated Civil Statutes, 1914, Articles 7796 to 7818 inclusive; Newby v. W. T. Rawleigh Co., 194 S. W., 1173; Whisenent v. Shores-Mueller Co., 194 S. W., 1175; Caddall v. J. R. Watkins Co., 227 S. W., 226; W. T. Rawleigh Co. v. Smith, 231 S. W., 799; J. R. Watkins Co. v. Myers, 225 S. W., 1005.

On the question as to whether the case being interstate commerce is therefore exempt from the Texas Anti-Trust Laws, we refer the court to: Caddall v. Watkins Med. Co., 227 S. W., 239; Fuqua, Hinkle & Davis v. Pabst Brewing Co., 90 Texas, 302.

Under the plain terms of the printed contract there is in the hands of the appellant the absolute power to dictate by a mere suggestion. In other words, with the above provisions which give the appellant company the power to curtail the amount of goods delivered, and to terminate the contract at any time, whereby all of the indebtedness then accrued under such contract would become immediately due and payable, we contend that such provisions make letters, papers, communications, or instructions of any kind sent by appellant to appellee as binding as though they were a part of the signed contract. If the appellee had not assented to and obeyed such instructions, he would have been coerced into such acquiescence.

It therefore follows that in order to ascertain the complete contract between the parties, under which the sale was afterwards made, we must look not only to the written contract, but also to the conditions imposed in the printed literature sent by appellant to Land and by the latter assented to and observed.

Under the agreement between plaintiff and defendant there

was a complete and direct sale of the goods in question to the defendant by the plaintiff; and as a result of such sale. when the goods came into the hands of defendant and were broken from their original packages and offered for sale, they lost their character of interstate commerce and therefore became subject to the Anti-Trust Act of Texas.

The contract in this case is absolutely void under the Anti-Trust Act of Texas, and could not have been under any circumstances ratified by appellee Land. Simpkins on Contracts, 3rd Ed., page 384; Davis v. Sittig, 65 Texas, 489.

Mr. Judge NICKELS delivered the opinion of the Commission of Appeals, Section A.

### STATEMENT OF THE CASE.

Suit was filed by the W. T. Rawleigh Company, an Illinois corporation, against B. B. Land, as principal, and G. W. Skinner, G. R. Bobo and J. T. Graham, as guarantors, in the District Court of Fannin County, on the——day of————, 1923, to recover a debt alleged to have been provided for in the instruments to be considered. The defendants alleged that an agreement existed between the company, on the one hand, and the remaining defendants, on the other, of such nature as to be in violation of the state anti-trust laws, thus rendering the contract unenforceable.

The jury in response to a special issue found that Land was restricted to defined territory in making sales of his goods. Thereupon judgment was rendered for the defendants. This judgment was first reversed and rendered, and then, upon rehearing, was affirmed by the Court of Civil Appeals for the Sixth District. 261 S. W. 186.

The case is in the Supreme Court on questions involving the legality of the contract.

### OPINION.

1. The paper contemporaneously with which relations between Land and the Company began (quoted in full in 261 S. W., 186), contains ten numbered paragraphs. The first is merely formal. The last declares no agreement is made except that contained in the instrument, etc. The remaining parts naturally fall into one or the other of two groups, and they will be considered in that order.

(a) Paragraphs two and three state Land's desire to purchase "at wholesale" and the company's "agreement to sell," f. o. b.

Memphis, Tenn., or Freeport, Ill., or "at any other point agreed upon," "such of its manufactured products as the seller shall hereafter determine to sell to said buyer" at then "current wholesale prices," the "kind and quantity of which is to be optional with the said seller." According to Paragraph Five, "the seller will at its option also sell to the buyer a wagon," etc., "for cash" or on credit. If the "buyer" so purchases, then, per the terms of Paragraph Four, he "agrees to pay the seller the invoice price."

In Paragraph 6 it is provided that either party may, at any time * * * by written notice, terminate this agreement."

Paragraph Eight evidences "agreement" of the Company to buy back from Land such goods as "he may have on hand" if Land returns them during or immediately after "the life of the contract." As context of the other paragraphs this "agreement" is purely contingent upon the will of either party, for Land could have no goods "on hand" unless the Company first agrees to sell and Land agrees to buy.

In respect to purchases of goods, etc., the foregoing includes all of the supposed "agreements" and "obligations" of the "contract." Those provisions, obviously, mean only this: If, in the future, Land desires to purchase something from the Company, and *then* orders it, the Company will *then* determine whether it desires to sell *anything* to Land; if it decides to sell him *something,* it will *then* decide the "kind and quantity" of what it cares to sell, and the price and whether "for cash" or on credit; if Land then still desires to purchase that "kind and quantity" at that price and on those terms, he may do so, provided the Company does not change its mind at the last moment.

Thus far, the paper is paper—and nothing more. No obligation to sell anything at any time or on any terms—or to do anything else—is laid upon the Company, nor is Land bound to buy at all, or to do anything whatever. No right is created and no obligation is declared. The parties are left exactly where they were before. Neither is required to move except at his own will. Hence, there is no contract here.

"It is nothing more than a contract to enter into a contract, in the future, if the parties can then agree to contract." Weegham v. Killifer, 215 Fed., 170. And no right of action can be predicated on it. Williams v. Phelps, Civ. App., 171 S. W., 1100; Hume v. Bogle, Civ. App., 204 S. W., 673; Bean v. Holmes, 236 S. W., 120; Gordon v. Emerson Shoe Co., Civ. App., 242 S. W., 795; Cold Blast T. Co. v. Nut Co., C. C. A., 114 Fed., 77; Rutland Marble Co. v. Ripley, 10 Wall., 339, 19 L. Ed., 955; Metropolitan Exhibition Co. v. Ewing, 43 Fed., 198, 7 L. R. A.,

381; Bijur Co. v. Eclipse Co., 243 Fed., 604; Manning v. Ayers, 77 Fed., 690, 23 C. C. A., 405; Stagg v. Compton, 81 Ind., 171; 9 Cyc., 245; 13 C. J., Secs. 100-1; Elliott on Contracts, Vol. 1, Sec. 175.

But the spectacle of men thus solemnly covenanting about nothing involves more than transparent folly. It indicates use of language to conceal thought. And this, in turn, invites close scrutiny of what is left of the paper.

(b) Paragraph seven declares that "if dealings conducted hereunder are mutually agreeable," a "new contract" may be made for the next year. This, of course, is wholly without sense, if considered as an attempt to define a right or obligation; but, as a threat and warning of what will happen unless Land conducts himself "agreeably" and "satisfactorily" it has a measure of reason. Its prophetic application is to things next appearing.

The balance of the instrument (with an exception to be noted) is in paragraph nine, which reads thus:

"It is mutually understood that the seller will furnish the buyer, from time to time, with educational salesmanship literature consisting of Rawleigh's Weekly, Guide Book, and other booklets, bulletins, leaflets, and letters of advice and suggestions, for the sole purpose of aiding and assisting buyer in making sales and collections; but it is expressly agreed that nothing contained in any of the aforesaid literature, letters, booklets, bulletins, leaflets, etc., shall be taken in any wise to alter, modify, change, or affect this agreement, and shall only be considered as educational and advisory; and it is further expressly understood and agreed that any advice or suggestions contained therein is not to be considered by the buyer as orders, directions or instructions, nor in any way binding on him; it being mutually and fully understood and agreed that the said buyer is not, nor never has been, an agent or representative of the seller, but in business strictly for theirself."

Here is an expressed promise by the Company to furnish "educational salesmanship literature" to Land, "from time to time," and a plainly implied promise by Land to receive the "literature" and ponder its "advice and suggestions" in connection with his resale business. To this mutual agreement is coupled the proviso, that "advice and suggestions" are not to be considered as binding on Land. The proviso, of course, is without meaning, except as a self-serving declaration of intent whose prima facie evidential value, if any, is greatly diminished by the patent efforts at concealment and wholly destroyed (or rather turned

against the the parties) if, in fact, a bad purpose appears in the execution of the agreement. We say it is otherwise meaningless, because Land was not at all obligated to buy, nor was the Company bound to sell; consequently, the "literature" could have no present "binding" effect as against his will.

The declared purpose of the agreement to furnish, receive and consider the "literature" is to "aid and assist" Land in making sales, etc., of such goods as he may have bought of the Company.

If the communication advised or suggested the doing or omission of acts by Land, and, thereupon, or by reason thereof, he decided to do those acts, an agreement between him and the Company was accomplished. The Company says to Land: "We are mutually interested in the success of your business; we agreed long ago that it was our right and duty to advise you, and make suggestions, so as to aid and assist you in making sales; hence, we believe you will make more or better sales and thereby make more money for all of us, if you will do thus and so, and we, therefore, in virtue of our right, duty and interest, advise and suggest you do that thing." Land desires to stay in business. The Company, in virtue of law, has the right (which it also declared in words) to terminate relations at will, and of this right Land has knowledge. He remembers, also, the Company has already said that unless he shall be "agreeable" and his dealings "satisfactory" it will have no business with him next year. He thinks, also, that the method proposed will, if adopted, redound in profit. He readily contributes (by word and act) new acceptance of the proposition embraced in the suggestion as it was contemplated he would do. What was mutually intended (thus agreed to) ab initio sequently appears in practically interpretative conduct. State v. Racine Sattley Co., Civ. App. 134 S. W., 400, 404; State v. Livestock Exchange, 211 Mo. 181, 109 S. W., 677, 124 Am. St., 776. Thereupon perfection of the arrangement (contemplated and provided for in future in the instrument) is wrought.

If the subject-matter and object are lawful, an enforceable contract is made. If the purpose be unlawful, it prevents enforcibility of the obligation, but it does not remove or terminate the agreement (combination) itself. The true purpose, as well as details of its achievement, not being clearly or fully defined in the writing, they are supplied extrinsically by proof of what the parties said and did in its execution, despite what the paper says about the all-comprehensiveness of its provisions. The instrument employs the most general of terms and words of doubtful import. What "advice"—what "suggestions"—are to

be given are not defined except by reference to "educational salesmanship literature" to be furnished, but whose text is not given. Nor is there an effort made at working out the exact boundaries of the proposed "aid" and "assistance." The true and exact sense in which the terms were used by the parties is, therefore, undisclosed—as written, their meaning is indefinite and ambiguous. And, therefore, proper subject to proof aliunde. Whisenant v. Shores-Mueller Co. Civ. App., 194 S. W., 1177, and cases there cited; Dewees v. Lockhart, 1 Texas, 535, 538; Franklin v. Mooney, 2 Texas, 454; Stamper v. Johnson, 3 Texas, 4; Bender v. Pryor, 31 Texas, 342; Kelly v. Robb, 58 Texas, 379; Schaub v. Dallas Brewing Co., 80 Texas, 636; La Brie v. McKim, 56 Texas Civ. App., 322, 120 S. W., 1083, and cases there cited; Rogers v. Broadnax, 27 Texas, 238; Cleburne Water Works Co. v. Cleburne, 13 Texas Civ. App., 141, 35 S. W., 733; 9 Cyc., 588-9.

As to the instrument signed by Land in 1917, and renewed in 1918, 1919, 1920, and 1921 (with the exception to be noted) we conclude: First—Except for, and as provided in, paragraphs seven and nine it did not amount to an agreement. Second—It did, in paragraphs seven and nine, contain an executory agreement, which became complete and executed by acts of the parties. Third—As so made and consummated, the jury's finding is conclusive of its unlawful original (and continuing) purpose, which purpose, thus intended and achieved, was in violation of Articles 7796, 7798, 7799, and 7807, R. S. 1911, and Article 1466, Penal Code. Segall v. McCall Co., 108 Texas, 55, 184 S. W., 188; Fuqua v. Brewing Co., 90 Texas, 298, 38 S. W., 479, 29, 750; T. & P. Coal Co. v. Lawson, 89 Texas, 394, 34 S. W. 919; Texas Brewing Co. v. Templeman, 90 Texas, 277, 38 S. W., 27; Whisenant v. Shores-Mueller Co. Civ. App., 194 S. W., 1175; Caddall v. Watkins Med. Co., Civ. App., 227 S. W., 226; Rawleigh Co. v. Watson, 256 S. W., 955; Rawleigh Co. v. Smith, 231 S. W., 799; Rawleigh Co. v. Newby, 194 S. W., 1173. Fourth— This unlawful agreement and its execution had sole reference to the methods of Land's resales (local to Fannin County, Texas). After the property had become his own and had been incorporated in the mass of property in the State; perforce, no element or aspect of interstate commerce was involved. Waters-Pierce Oil Co. v. Texas, 212 U. S., 99, 29 Sup. Ct., 222, 53 L. Ed., 425; same case, 48 Texas Civ. App., 162, 918; Browning v. Waycross, 233 U. S., 16; General Ry. Signal Co. v. Virginia, 246 U. S., 500; American Steel Wire Co. v. Speed, 192 U. S., 500; Brown v. Maryland, 12 Wheat, 419; May v. New Orleans, 178

U. S., 496; Woodruff v. Parham, 8 Wall., 123; Brown v. Houston, 114 U. S., 622.

In respect to the conclusion last stated, we may add that if it were true that some relation did exist between the agreement and interstate commerce, that connection—and its effect, if any —would be indirect and too remote to oust the State's power. Even a contract of purchase and sale of merchandise to move from one state into another (such as was under consideration in Dahnke-Walker Co. v. Bondurant, 257 U. S., 282) may also include provisions whose validity, manner of enforcement, etc., are to be governed by State law. This is squarely determined in General Ry. Signal Co. v. Virginia, supra, and it is recognized in New York Mfg. Co. v. Colley, 247 U. S., 21—cited here by plaintiff in error. In that situation, the test is whether the particular stipulation is both "relevant and appropriate"—"that which is inherently intrastate does not lose its essential nature because it forms part of an interstate commerce contract to which it has no necessary relation." York Mfg. Co. v. Colley, supra; Fuqua v. Brewing Co., supra; Segal v. McCall Co., supra.

The nature and meaning of the instrument, as finally interpreted in the light of the jury's finding, being that described, the unlawful agreement had no direct, "appropriate" or "necessary" relation to interstate commerce. It referred to sales of his own property (long since at rest in the State) made, and to be made, by Land within a defined territory of the State and to persons there residing.

The additional matter in the 1921 "contract" signed by Land is his agreement (in Paragraph 4) "to pay * * * any balance due" the Company "at the date of the acceptance of this renewal contract." This new promise to pay is a substantial part of the consideration for the unlawful agreement. The illegal and the legal considerations (if there be any legal ones) are inextricably mingled and the papers (or other facts) do not furnish means whereby the unlawful considerations may be exclusively apportioned to the improper obligations so as to leave a valid obligation, complete in itself, supported by an independent valid consideration (if any such there be). This portion of Paragraph 4, it results, is within the general rule "that a promise made upon several considerations, one of which is unlawful, no matter whether the illegality be at common law or by statute, is void" (Edwards County v. Jennings, 89 Texas, 618, 35 S. W., 1053, 1054, and authorities there cited; Wegner Bros. v. Niering, 65 Texas, 506, same case, 76

Texas, 506, 13 S. W., 537; Reed v. Brewer, 90 Texas, 144, 37 S. W., 418).

The Company's suit is not one upon the "orders" and "acceptances" whereby goods were procured from it by Land. The proof, without question, shows that each purchase was upon an "order" and "acceptance" thereof then made, and that complete and perfect title to the goods of each consignment passed to Land at Memphis, Tenn., or at Freeport, Ill. The claim to relief is based, expressly, upon the written instrument above described and upon another agreement signed by Bobo, Skinner, and Graham, as "guarantors," which is physically attached to the one signed by Land and which, by express and specific reference, incorporates that signed by Land. These papers are attached to the Petition, as a part of it, and are thus pleaded in haec verba as the basis of the Company's rights. They are there declared to be "the contract made by plaintiff and defendants, and it has not been annulled, substituted, changed or modified." The suit, then, is not one to recover the price, or value, of goods sold in interstate commerce; under our law, and practice, it is purely a suit upon the agreements evidenced by those papers—executed years after much of the so-called indebtedness had accrued—and the rights under the pre-existing agreements made in the "orders" and "acceptances" have been abandoned. Coles v. Kelsey, 2 Texas, 542, 47 Am. Dec., 661; Cain v. Bonner, 108 Texas, 399, 402, 194 S. W., 1098. Having declared upon the so-called "contracts" of Jan. —, 1921, as a matter of State law, "the plaintiff's right of recovery was measured by them." Cain v. Bonner, supra. The two papers are made one and inseparable by the facts, by mutual reference, and in the pleading. The one (signed by Land) as shown, embraces and requires unlawful things, and in the other the "guarantors" are made to, and do, "fully assent and agree" to "all of the terms, provisions and agreements" evidenced by the first. And but for this "assent" and "agreement" by the guarantors (the papers and the proof show) the unlawful agreement between Land and the Company would not have been made or consummated.

Violation of the State's Anti-Trust Law involves commission of a felony. Art. 1635, Revised Crim. Stat., 1925. Every person who encourages, etc., commission of crime is a principal. Arts. 65, 69, Ibid. A person who enters into a trust agreement or "understanding of any character," "becomes a party

thereto or shall do any act in furtherance thereof" or in "aid" thereto, is guilty of a felony. Art. 1637, Ibid. By the very tie which binds them the "guarantors" are required to assume and share the guilt of Land and the Company. It is thus "nominated in the bond." The guilt cannot be so allocated as to wipe the taint from one part of the contract and heap all contumely upon another part. The vice, as is the corrupted agreement, is indivisible. Segal v. McCall Co., supra.; Fuqua v. Brewing Co., supra.

As pleaded, the plaintiff's case could not be made out without bringing to its aid, and to the consideration of the court, the unlawful transactions. Hence there is no bases for recovery upon the theory (urged) that the "illegal contract has been executed, the unlawful conduct has ended." The situation disclosed is one which makes the authorities cited to the proposition, (i. e. Hall v. Edwards, 222 S. W., 167; De Leon v. Trevino, 49 Texas, 91, 30 Am. Rep., 101; Cain v. Bonner, supra; Floyd v. Patterson, 72 Texas, 202; Haswell v. Blake, 90 S. W., 1125; Owens v. Davenport, 39 Mont., 555, 104 Pac., 682, 28 L. R. A. (N. S.) 996; Martin v. Richardson, 94 Ky., 183, 21 S. W., 1039, 19 L. R. A., 692, 42 Am. Rep. 353; Hertzler v. Geigley, 196 Pa., 419, 46 Atl., 366, 79 Am. St. Rep., 724; Hubbard v. Mulligan, 13 Colo. App., 116, 57 Pac., 738; Packard v. Byrd, 73 S. C., 51 S. E., 678, L. R. A. (N. S.) 547) condemn, rather than support it. The statute (Art. 7437, R. S. 1925) declares any such contract or agreement to "be absolutely void and not enforcible either in law or equity." That all-pervading force of the law which has been contemned may not rightly be broken, or tempered, by anything exhibited in this record.

We recommend an affirmance of the judgment.

MR. CHIEF JUSTICE CURETON delivered the opinion of the Supreme Court.

Consideration of the facts convinces us that the written contracts between the parties, interpreted in the light of the actual practices between them, were prepared and signed for the purpose of violating the Anti-Trust Laws of this State within the State, and that the obligations arose in consummating this purpose. This leads to our concurrence in the opinion of the Court of Civil Appeals on motion for rehearing and in the recommendation that the judgment of the Court of Civil Appeals be affirmed, and it is so ordered.